IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 16-cr-30041-MJR |
| | ) | |
| ANDREW TILLMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

**REAGAN, Chief District Judge:**

A March 22, 2016 indictment charges Andrew Tillman with possession with intent to distribute methamphetamine, possession of a firearm in furtherance of a drug trafficking crime, and felon in possession of a firearm—the indictment says that Tillman was arrested with 50 grams of methamphetamine and a .45 caliber Kimber 1911 semi-automatic pistol on December 14, 2015. Tillman has pled not guilty, and is currently set for trial on October 31, 2016. In July 2016, Tillman moved to suppress the evidence found on Tillman's person and in the Tahoe that Tillman was allegedly driving on December 14th, as well as the statements Tillman made to police on that same date. A hearing was held on October 11, 2016, and the Court took Tillman's motions under advisement. For the reasons stated herein, the Court denies the motions to suppress.

## Background

Tillman's motions to suppress focus on the events surrounding his arrest on December 14, 2015, so the United States naturally presented testimony at the

suppression hearing from Detective Jeff Jensen, who stopped and arrested Tillman that night, and from Investigator Shane Brown, who ultimately took possession of the drugs and firearm found in Tillman's vehicle that night and interviewed Tillman the next day. Detective Jensen testified first, stating that he was on patrol in an unmarked vehicle on the night of December 14th with his partner, Detective Aaron Hackleman.  Shortly before 10 PM that night, Jensen observed a grey Tahoe approaching the intersection of Lebanon Avenue and North Douglas, traveling westbound.  As the Tahoe approached the intersection, Jensen saw the Tahoe almost strike the curb and then travel through the intersection.  Jensen saw the license plate on the Tahoe (Illinois plate Y973158) and turned his cruiser around to follow it.[1]  As he was turning, Jensen saw the grey Tahoe accelerate down Lebanon in excess of the speed limit and turn right onto Clay Street. Jensen then testified that he followed the Tahoe onto Clay and saw the Tahoe proceed to the intersection of Clay and Charles.  According to Jensen, the Tahoe then turned right onto North Charles, without signaling and without abiding by the stop sign.

---

[1] Jensen testified at the suppression hearing that he ran the grey Tahoe's license plate through the computer at the time that he first saw it.  That testimony led Tillman's counsel to ask the United States to tender any evidence that it had concerning when Jensen ran the license check—according to counsel, if Jensen ran the registration around the start of the dashcam recording, that would bolster Jensen's credibility, but if the registration was ran much later, say mid-way through the stop, it would harm it.  The United States located the evidence in question, which reflects that Jensen ran the registration at 9:58 PM on December 14, 2015.  The dashcam shows that Jensen began to follow the grey Tahoe at 9:57 and reached Tillman at the very start of 9:58, so the registration record is at best a wash for Tillman and at worse bolsters Jensen's claim that he ran the registration roughly at the start of the chase.  Given that ambiguity, Tillman's counsel indicated to the Court that he didn't wish to supplement his motions to suppress in light of the registration record, and instead wished to stick with the arguments that he made in Tillman's favor at the suppression hearing and in his briefs.

Around that time, Jensen said that he turned on his cruiser's emergency lights and continued to follow the Tahoe with the intention of stopping it for traffic violations.

As the Tahoe approached north Douglas while purportedly traveling on Charles, Jensen testified that he saw the Tahoe's taillights go out.  The Tahoe then turned right onto Douglas, again without signaling or stopping at the stop sign.  Jensen followed onto Douglas but lost sight of the Tahoe.  There was an alley shortly up Douglas Street between Church Street and Lebanon Avenue, so Jensen turned right down that alley and found the Tahoe with the same license plate parked in a driveway a short way down the alley.  Jensen saw a male in the process of exiting the Tahoe and got out of his vehicle to approach him.  Jensen testified that he recognized the man as Tillman right after he got out of his unmarked cruiser—he knew Tillman from a past arrest in 2009, during which Tillman told Jensen that he was going to prison in the near future.  As Jensen approached Tillman, he asked him why he was running from the police.  Jensen then observed cannabis residue on Tillman's shirt and smelled cannabis on him.  He asked Tillman if he had cannabis on his person, and Tillman said no.  Jensen asked again, and Tillman admitted to having a "little bit" of marijuana on him.  Jensen then searched Tillman and found two bags of cannabis in his jacket pocket.

After Detective Jensen's search, Tillman was placed in custody, and Jensen requested that a canine officer be dispatched to the scene.  Shortly around that time, Detective Hackleman also walked up to the Tahoe that Tillman was driving and looked on the floorboard, observing a firearm within the vehicle.  Jensen walked up to the side of the car and saw the firearm inside as well.  Jensen took a picture of the gun through

3

the Tahoe's window; the photograph depicted the firearm sitting partly underneath the Tahoe's driver's seat.  A canine unit arrived about fifteen minutes after Jensen called for it, and the canine ultimately alerted to the presence of narcotics in the grey Tahoe that Tillman was driving.  Police then searched the grey Tahoe and seized several packages of cannabis, two bags of methamphetamine, a bag of cocaine, some other narcotics, and the handgun that police previously observed under the driver's seat.  Jensen then contacted Investigator Shane Brown, who took possession of the items seized from Tillman and the Tahoe that he was driving.  Tillman was then transported to the St. Clair County Jail and held on drug and firearm charges.

As Jensen confirmed at the suppression hearing, his unmarked police cruiser was equipped with a dashcam on the night of Tillman's arrest, so most of the chase and all of the arrest were documented on video.  The video is largely consistent with Jensen's initial testimony, but there are some differences.   The tape begins with Jensen performing a u-turn at the corner of Lebanon and Douglas, and the grey Tahoe that he says he saw before the dashcam is turned on is no longer in immediate view, presumably having passed him.  As Jensen completes the u-turn, he accelerates to around 30 miles per hour, and long before Jensen reaches the intersection of Lebanon and Clay the video shows a large suburban utility vehicle, light in color, turn onto Clay. The fact that the utility vehicle reached Clay so quickly after Jensen completed his u-turn suggests that it was traveling at a high rate of speed.  Jensen reaches Clay in moments and turns right.  The video doesn't seem to capture the utility vehicle when Jensen turns right onto Clay.  Jensen then turns right at the next cross street—which

looks to be Church Street and not Charles Street as Jensen testified—and at that moment Jensen turns on his emergency lights.  A large, light-colored vehicle can be seen in the distance seemingly moving at a very fast rate of speed; it looks as if it failed to stop at the stop sign at the intersection of Douglas and Church and turned right onto Douglas without signaling.  The video then shows Jensen accelerating quickly down Church.  After that, Jensen turns right onto Douglas, and one of the officers in the vehicle—Jensen or Hackleman—can be heard saying "Where'd he go?"  The other then says "He had to have gone down that alley."  The video shows an alley immediately to the right—between the corner of Church and Douglas and the upcoming intersection of Lebanon and Douglas—and Jensen turns onto it.  A short ways down, the dashcam shows Jensen stop his car, back up, and turn into a driveway with a light Tahoe parked in it.  A man is seen standing next to the Tahoe, and the vehicle's driver side door is open.  As a slight inconsistency between Jensen's testimony and the dashcam audio, Jensen can be heard identifying the man as Tillman before Jensen exits his cruiser.

As Jensen's cruiser gets all the way into the driveway, the video shows Tillman leaning into the driver's side of the vehicle.  Jensen then exits his cruiser and shouts "Let me see your hands" at Tillman.  Tillman leans out of the vehicle and approaches the officers, closing the Tahoe's driver's side door in the process.   Jensen asks Tillman why he was driving in the manner that he did, and Tillman's response can't be made out.  Jensen then asks Tillman to step closer to him, and Tillman does so.  Jensen asks Tillman about how he's been, Tillman says he's fine and asks Jensen what he did wrong, and Jensen tells Tillman that he saw Tillman "ran that stop sign right there" and

that it seemed as if Tillman was trying to evade police.  Jensen then asked Tillman whether he had anything on him that Jensen needed to worry about, and Tillman said no.  Jensen went on to ask Tillman if he had a "little weed" on him, and Tillman first says no, but when asked again, Tillman admits to having some marijuana in his pocket.  The video shows Jensen searching Tillman, seizing the marijuana, and then placing him in custody.  It also depicts Tillman yelling that he was driving his mother's Tahoe that night, and an officer (presumably Jensen) telling Tillman's mother that Tillman had attempted to elude police, that officers found marijuana on Tillman, and that officers were going to have a canine do an open air sniff around the Tahoe.  The video doesn't depict the canine sniff—the cam video was switched towards the interior of the car to record Tillman in custody—but it was switched back at a later point, showing officers removing a large amount of drugs out of the Tahoe that Tillman was driving that night.

After Tillman's arrest, Detective Jensen drafted a police report concerning the events of December 14, 2015.  That report, too, was largely consistent with Jensen's testimony and the video recording, but there were a few differences.  The report said that Jensen saw the grey Tahoe with license plate Y973158 at the intersection of Lebanon and Douglas; that Jensen saw the Tahoe swerve and nearly strike the curb; that Jensen turned his patrol vehicle around to follow; and that the Tahoe then accelerated quickly, exceeding the speed limit of 25 miles per hour.  That's all consistent with Jensen's testimony and the start of the dashcam video—while the video doesn't show the grey Tahoe at the intersection of Lebanon and Douglas, it does start right at the time that Jensen turns around on Lebanon Avenue, and by the time Jensen accelerated to 30 miles

per hour to follow the purported Tahoe, a large light-colored vehicle can be seen fairly far ahead of Jensen, already having cleared some distance.  The report goes on to say that Jensen intended to stop the Tahoe when he turned his cruiser around, that the grey Tahoe turned right onto Benton Street, and that Jensen activated the emergency lights on his cruiser to initiate a traffic stop when the Tahoe turned onto Benton.  That's partly inconsistent with the other evidence.  Jensen admitted on direct examination that he didn't intend to stop the Tahoe until he turned his emergency lights on; that the Tahoe turned onto Clay Street rather than Benton Street (which was one cross street up from Benton on Lebanon); and that Jensen didn't turn his emergency lights on until after the Tahoe made a turn onto Clay Street and another turn after that.  The report next states that the Tahoe turned right off of Clay and onto Church without signaling or stopping at the stop sign, accelerated down Church, and then turned right off of Church and onto Douglas, again without signaling or stopping.  That's consistent with the dashcam video but a bit inconsistent with Jensen's testimony.  The dashcam has Jensen pursuing right onto Church from Clay, contrary to Jensen's correction at the hearing that he followed the Tahoe right onto Charles from Clay.  (Charles was one cross street up from Church on Clay.)  The dashcam does show a large, light-colored vehicle in the distance on Church, and it looks as if that vehicle is moving at a high rate of speed down Church and that it failed to stop or signal at the intersection of Church and Douglas.

Aside from the error regarding Church Street versus Charles Street, the rest of Jensen's report is fairly consistent with Jensen's testimony and the dashcam video.  The report says that Jensen briefly lost sight of the Tahoe after arriving at the intersection of

Douglas and Church, that he followed onto Douglas, that he turned right down an alley that was located immediately off of Douglas between Church and Lebanon Avenue, and that he found a grey Tahoe with the same license plate shortly up the alley, parked in a driveway.  Jensen saw Tillman exiting the Tahoe and pulled into the driveway to talk to him, leading to the search of Tillman, the search of the Tahoe, and Tillman's arrest.  (The report also indicates that Jensen recognized Tillman before he exited his unmarked cruiser, another small inconsistency between his testimony and the report.)

That covered everything about Detective Jensen, so the United States proceeded to call Shane Brown, an investigator with the St. Clair County Sherriff's Department. Brown said that he was contacted by Jensen on December 14, 2015 and was advised by Jensen that officers had found a firearm and illegal narcotics in the car Tillman was driving.  Brown took possession of those items from Jensen.  The next day, Brown and an agent of the Drug Enforcement Agency interviewed Tillman at the St. Clair Jail. Upon entering an interview room at the jail with Tillman, Tillman made a number of unsolicited comments, including that he had done something wrong and that he wasn't trying to run from police.  Brown then read Tillman his *Miranda* rights, and Tillman said he wasn't going to provide a statement until he was given a deal.  Brown told Tillman he couldn't discuss a deal, and the interview ended.  Given the evidence seized from Tillman, he was ultimately indicted on federal drug and gun charges.

## Discussion

Tillman makes a number of arguments in favor of suppressing the evidence seized on December 14, 2015 or the statements he made to Detective Jensen that night,

8

but he complains the loudest about whether officers even had cause to stop him at all, so the Court will start there.  Officers could have stopped Tillman as he exited his vehicle if they had probable cause to believe that he committed even a minor traffic offense, *United States v. Muriel***, 418 F.3d 720, 725 (7th Cir. 2005)**, or they could have stopped him (in the vein of *Terry v. Ohio***, 392 U.S. 1, 21-22 (1968)**) if they had reasonable suspicion to believe that he had violated the traffic laws, *United States v. Miranda-Sotolongo***, 827 F.3d 663, 666 (7th Cir. 2016)**.  Probable cause to stop would exist if the circumstances confronting the officer support the reasonable belief that the defendant committed a traffic offense, *Muriel***, 418 F.3d at 724**, while reasonable suspicion would exist if the officer could identify some particularized and objective basis for thinking that the person to be stopped is or may be about to engage in unlawful activity, *Miranda-Sotolongo***, 827 F.3d at 666**.  The United States has the burden of proving, by a preponderance of the evidence, that a traffic stop was backed up by probable cause or reasonable suspicion.  *United States v. Peters***, 743 F.3d 1113, 1115 (7th Cir. 2014);** *United States v. Uribe***, 709 F.3d 646, 650 (7th Cir. 2013).**

In light of Jensen's report, the dashcam recording, and Jensen's testimony, the Court is of the view that Jensen had probable cause to stop Tillman for committing traffic violations on the night of December 14th.  All of the evidence, taken together, shows that Jensen saw a grey Tahoe with license plate Y973158 at the intersection of Lebanon and Douglas on the night in question, that the same Tahoe exceeded the speed limit while moving away from Jensen on Lebanon, that the Tahoe turned right onto Clay from Lebanon, that it turned right onto Church from Clay without signaling or

stopping at the stop sign, that the Tahoe exceeded the speed limit while driving down Church Street away from Jensen, and that the Tahoe turned right off of Church Street and onto Douglas Avenue, again without signaling or stopping at the stop sign.  The evidence also shows that Jensen followed the same Tahoe onto Douglas Avenue, that Jensen briefly lost sight of it, that Jensen took the first alley he reached on Douglas Avenue, between Church Street and Lebanon Avenue, and that Jensen quickly reacquired the Tahoe.  That Tahoe had the same license plate as the grey Tahoe Jensen had just lost sight of, and Tillman was in the process of exiting that Tahoe at the time that Jensen pulled up.  The fact that Jensen saw the license plate of the grey Tahoe when he started following it, that the vehicle with that plate was seen violating one of many traffic laws, and the fact that Tillman was exiting the vehicle with those plates when officers found it shortly after losing sight of it is enough to prove probable cause for a stop by a preponderance of the evidence.  *E.g.*, *United States v. Thompson*, 591 F. App'x 652, 657 (10th Cir. 2014); *United States v. Davidson*, 527 F.3d 703, 706 (8th Cir. 2008), *partly vacated on other grounds by United States v. Davidson*, 551 F.3d 807, 808-09 (8th Cir. 2008); *United States v. Casillas-Munoz*, 542 F.2d 508, 510 (9th Cir. 1976).

Tillman makes much of some inconsistencies between parts of Jensen's testimony and parts of the dashcam recording and his arrest report, but despite any possible inconsistencies, the Court still finds Jensen's testimony supporting probable cause for the stop to be credible.  Jensen's slip-ups in street names, both as it concerned Benton Street and as it concerned Charles Street, were both understandable—Jensen explained his flub with Benton Street, and a look at the map of the area reflects that the first turn

as one moves onto Clay Street from Lebanon Avenue was an alley and not an actual road, meaning that it would be very easy for a witness to err on the sequence of cross streets and mistake the first cross street off Clay Street (Church) for the second one (Charles).  In addition, the Court doesn't see a clear inconsistency between Jensen's testimony that he sped up to follow the Tahoe after first spotting it on Lebanon and the dashcam speed monitor, for the speed monitor shows that Jensen accelerated to at least 30 miles per hour to follow the Tahoe, and the visual cues from the tape suggest that Jensen may have been going faster than that and that there may have been a lag between the speed monitor and the car's actual speed.   Finally, the minor inconsistencies concerning when Jensen turned on his cruiser's lights and when Jensen recognized Tillman as the male exiting the Tahoe are largely irrelevant to the issue of probable cause to stop Tillman—when Jensen turned on the lights, he had seen the Tahoe violating traffic laws, and when he recognized who Tillman was, he had already seen Tillman exiting the Tahoe.  Small errors don't prevent a judge from finding a witness credible.  *See United States v. Abernathy*, **258 F. App'x 903, 906 (7th Cir. 2007).**

At the end of the day, the dashcam video, while sometimes difficult to make out, corroborates Jensen's account that he saw a suburban vehicle speeding and violating other Illinois traffic laws on December 14, 2015, that he followed the vehicle to the corner of Douglas and Church, that he found a similar vehicle roughly thirty seconds later in the alley off Douglas, and that Tillman was right next to that Tahoe, seemingly in the process of exiting it, when Jensen arrived in the driveway.  In part because the video backs up Jensen's account in critical ways and in part because the Court views

Jensen's testimony as largely consistent and his demeanor as trustworthy, the Court finds Jensen's testimony supporting probable cause to be credible.  That includes Jensen's testimony that he saw the plate of the Tahoe when he performed a u-turn on Douglas and Lebanon, that the same Tahoe violated the speed limit on Lebanon in an effort to flee from Jensen's vehicle, that the same Tahoe violated other traffic laws in the side streets near Lebanon, and that Tillman was in the process of exiting the Tahoe with the same license plate that Jensen saw at the corner of Lebanon and Douglas.

Tillman goes on to argue that, even if Jensen had probable cause to perform a traffic stop, he improperly "extended" the stop when he asked him questions about marijuana.  There was no prolonged extension at that point in the stop—the dashcam video confirms that the questions about drugs came right after Jensen stopped Tillman, and initial investigations during the course of a traffic stop, even if unrelated to traffic matters, don't violate the Fourth Amendment.  *E.g., Rodriguez v. United States*, **135 S. Ct. 1609, 1615 (2015);** *Illinois v. Caballes*, **543 U.S. 405, 407-08 (2005);** *United States v. Walton*, **827 F.3d 682, 688 (7th Cir. 2016);** *United States v. Guidry*, **817 F.3d 997, 1005 (7th Cir. 2016);** *United States v. Sanford*, **806 F.3d 954, 959 (7th Cir. 2015);** *United States v. Taylor*, **596 F.3d 373, 376 (7th Cir. 2010);** *United States v. Horne*, **46 F. App'x 360, 362 (7th Cir. 2002).**  And even if the stop had gone long, reasonable suspicion of another crime can justify lengthening a stop, *Rodriguez*, **135 S. Ct. at 1615**, and reasonable suspicion definitely existed here.  At the time Jensen asked Tillman if he had drugs on his person, Jensen smelled marijuana wafting off Tillman and saw marijuana clinging to his t-shirt, and that's enough to provide officers with cause to investigate Tillman for

drugs.  *See, e.g., Guidry*, **817 F.3d at 1005 (officer could prolong stop when he smelled "faint odor of marijuana" during stop and was aware of defendant's drug history);** *United States v. Vazquez*, **253 F. App'x 365, 371 (5th Cir. 2007) (defendant's potential intoxication plus nervousness enough to lengthen initial traffic stop to investigate presence of drugs).**  Tillman again suggests that Jensen can't be believed about smelling or seeing marijuana because of the inconsistencies mentioned above, but for the reasons the Court already laid out, the Court finds Jensen's testimony that he saw marijuana residue on Tillman's shirt and smelled marijuana near Tillman to be credible.

Tillman doesn't seem to directly challenge the search of the Tahoe for drugs and a gun, but if his briefs could be read to make those challenges, they would fail.  Police could search the vehicle Tillman was driving if they had probable cause to believe that it contained evidence of criminal activity, *United States v. Nicksion*, **628 F.3d 368, 377 (7th Cir. 2010)**, and there was probable cause for the gun and drug search here.  Jensen testified that Detective Hackleman first saw a gun in plain view in the Tahoe that Tillman had recently exited, so Jensen moved to the car, confirmed that he saw the gun, and took a picture of it.  Jensen knew that Tillman was a felon given his prior encounter with him, and that knowledge—plus the plain view of the weapon—would have provided probable cause to seize the gun.  *See United States v. Curry*, **466 F. App'x 329, 330 (5th Cir. 2012).**  Jensen also heard Tillman admit to possessing drugs shortly after he got out of the Tahoe, found drugs on his person, and saw drug residue on his clothes— and those points were enough to provide cause to search the Tahoe for drugs.  *See United States v. Davis*, **569 F.3d 813, 818 (8th Cir. 2009);** *United States v. Harvey*, **16**

**F.3d 109, 112 (6th Cir. 1994).**  And even if they weren't, those facts at least would have given officers reasonable cause to extend the stop to perform a canine sniff, *Guidry*, **817 F.3d at 1005**, and the canine's alert would have given the officers all the cause they needed to search the car, *United States v. Bentley*, **795 F.3d 630, 635 (7th Cir. 2015).**

Tillman has one final suppression argument, this one concerning Tillman's admission on December 14, 2015 to Jensen that he had a "little bit of weed" on him. Tillman claims that the statement must be suppressed because it was a product of Jensen's questioning and Tillman was not given *Miranda* warnings before Jensen questioned him.  The statement would likely need to be suppressed if Tillman was in custody at the time he made it, but that's doubtful.  Whether a person is in custody for *Miranda* purposes turns on several factors, including the location of the questioning, whether the suspect consented to speak to officers, whether officers told the suspect that he was not under arrest, whether the suspect was moved to another area, whether there was a display of force, whether the officers deprived the suspect of things he would need to leave, and the officers' tone.  *United States v. Barker*, **467 F.3d 625, 628 (7th Cir. 2006).**  These factors are, of course, not exhaustive, and they are all designed to ascertain whether—in light of the objective circumstances—a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. *United States v. Borostowski*, **775 F.3d 851, 859 (7th Cir. 2014).**

Taking all of the facts here, the Court isn't of the view that Tillman was in custody when Jensen asked him about drugs.  At the time of Jensen's question, the traffic stop had just begun.  Tillman was not at a police station but in his own driveway;

he never refused to speak with officers; he wasn't moved to another area; he wasn't deprived of anything that he needed to go on his way; he wasn't handcuffed; he wasn't told that he was under arrest; only two officers were present; his freedom wasn't curtailed in a way similar to a full arrest; and Tillman doesn't claim that any officer drew his sidearm.  At the time of Jensen's question, then, the situation looked like a traffic stop or a *Terry* stop—the stop started with Jensen approaching Tillman and advising him of his recent traffic infractions, and immediately after that Jensen asked him a general question about drugs.  Traffic or *Terry* stops usually aren't seen as custodial within the thinking of *Miranda*. *E.g., Berkemer v. McCarty*, **468 U.S. 420, 440 (1984);** ***United States v. Johnson,* 680 F.3d 966, 974-75 (7th Cir. 2012)***, *overruled on other grounds by Fowler v. Butts*, **829 F.3d 788 (7th Cir. 2016).**  The Court says "usually" because atypical or lengthy stops might press into the land of custody, *see Johnson,* **680 F.3d at 974)**, but there was nothing atypical here—Jensen's question about drugs came right at the start of the stop.  Because Tillman wasn't in custody at the time that Jensen asked him about drugs, there was no Fifth Amendment violation.

<u>Disposition</u>

For the reasons stated above, Tillman's motions to suppress (Docs. 29 & 32) are **DENIED**.  The parties are reminded that this case is set for trial on October 31, 2016.

**IT IS SO ORDERED.**

**DATED:  October 17, 2016**

/s/ **Michael J. Reagan**
**Chief Judge Michael J. Reagan**
**United States District Court**